### KEENAN et al. v. NEW YORK, L. E. & W. R. CO.

(Superior Court of Buffalo, General Term. December 23, 1892.)

1. MASTER AND SERVANT—NEGLIGENCE—DANGEROUS APPLIANCES.

A railroad company kept in its yard, for use in repairing cars, three parallel and contiguous tracks, two of which were used for cars while being repaired by the workmen, and were kept safe, and the other of which was used only for the storage of crippled cars, and cars were continually being taken off and put on this track without warning to the workmen. Deceased, a workman repairing a car on the safe track, went under a car on the storage track for material which was generally obtained elsewhere, and was killed by a car being thrown in upon the track. He knew that the track was intended only for storage of cars, and that the rules of the company required that no work should be done there. *Held,* that the company was not liable on the ground that it failed to provide a safe place for deceased to work.

2. SAME—AUTHORITY OF FOREMAN.

The fact that his foreman directed deceased to go under the car to procure the material cannot render the company liable, in the absence of evidence that he was vested with authority to interfere with the rules as to the place where the men were to work.

3. SAME—ASSUMPTION OF RISK.

There could be no recovery against the company for the further reason that deceased was as well informed as it was as to the dangerous character of the work, and voluntarily proceeded with it.

Appeal from trial term.

Action by Bridget Keenan, as administratrix, and Willard W. Saperstone, as administrator, of John Keenan, deceased, against the New York, Lake Erie & Western Railroad Company, for personal injuries resulting in the death of decedent. From a judgment entered on a verdict for plaintiffs, and from an order denying a motion for a new trial, defendant appeals. Reversed.

Argued before WHITE and HATCH, JJ.

E. C. Sprague, for appellant.

Geo. W. Cothran, for respondents.

WHITE, J. In August, 1889, the plaintiffs' intestate was employed by the defendant as a car repairer in its yards in Buffalo. Three tracks ran parallel and contiguous to each other in those yards. One of them, known as No. "8," was used exclusively for storing crippled cars until such time as the workmen were ready to repair them, when they were transferred from track No. 8 to one of the other two tracks, which were known as Nos. "2" and "21," and the two last named were the only tracks on which any work in the way of repairs was done. Track No. 8 was open only at its easterly end, and crippled cars were being continuously thrown in upon and taken from that track, without notice or warning being given to any one, and no precautions were taken by the defendant to prevent accidents of the character of the one in question. From five to nine hundred men were employed in the yards. Workmen on tracks Nos. 2 and 21 protected themselves by flags, and no cars were moved on either of these tracks without notice to the workmen engaged in repairing cars upon them. Robert Gunn was the superintendent in charge and control of all the business in the yards, and he had an assistant named O'Day. The workmen were divided into gangs, with a foreman for each gang, who superintended their work, and Thomas Tracy was the foreman of the gang in which deceased was at work. While deceased was engaged in repairing a car on track No. 2, he had occasion to use a bumper spring in making repairs on such car. He had been instructed to apply to one of his fellow servants, named John Goetz, when in need of material for repairs, and it was Goetz's duty to procure such material from the supplies in the yards. Deceased applied to Goetz for this spring which he needed, and was informed by him that the defendant had none on hand. Thereupon deceased informed his foreman, Tracy, that he needed the spring, and it may be assumed that Tracy directed him to take one from a crippled car which was then stored on track No. 8, awaiting its turn to be placed on one of the other tracks itself for repairs. While the deceased was under that crippled car, engaged in the act of disconnecting the spring required by him, another car was shunted or thrown in upon track No. 8, against the one from which he was taking the spring, with such violence as to force it over his body, causing the injury complained of. The deceased was familiar with the use made of track No. 8, and with the way in which crippled cars were moved upon and off from it.

The whole duty of the defendant to the deceased required it (1) to furnish him a safe place in which to perform his work; (2) to supply him with

suitable implements and appliances with which to work; (3) to furnish competent coservants; and (4) to provide suitable and proper rules and regulations for the guidance of him and his fellow servants in the performance of their tasks. No well-founded claim can be made that the defendant was derelict in its duty towards the deceased in any of these respects, unless it is chargeable with the consequences of the act of the deceased in placing himself under the car on track No. 8, which ran over and injured him, without protection of any kind against injury, which was liable to and did in fact result from the manner in which the crippled cars were handled on track No. 8. It seems not to have been contemplated or intended by the defendant that any of its servants should at any time do any work of any kind on track No. 8, except to store cars thereon and remove them therefrom, but that that track should be, as it was, used exclusively for the storage of crippled cars while awaiting their turn for repairs. The statement of the case makes it apparent at once that this was the reason why no precautions were taken as to car repairers with reference to that track, and it must be conceded that the deceased knew it as well as the defendant. If, then, it was not a place provided nor intended for its workmen by the defendant, and they knew it, it is difficult to see how the defendant can be charged with violating its duty by one voluntarily going there to work. No rule or regulation of the defendant required it, but, on the contrary, its rules required that track No. 8 be used exclusively for the storage of crippled cars. A master cannot be held responsible for an injury to his servant, sustained in a place not contemplated, provided, or designated by him, no matter through whose negligence, on the ground that he has failed to furnish a safe place in which the servant is to do his work. In such a case the place is selected by the servant, and not by the master. The contention that, in requiring the deceased to go to work where he was injured, Tracy, his foreman, was discharging the duty of the master, cannot prevail, for the reason that there is nothing in the evidence justifying the conclusion that Tracy was vested with any authority to change, or in any manner interfere with, the rules and regulations of the defendant as to the places in which the deceased and his fellow servants were to do their work; and, as we have said before, those rules and regulations provided that all work should be done on tracks 2 and 21, and none on track No. 8. That those rules and regulations were sufficient is conceded for the purposes of this case, because the trial judge so charged the jury, and no exception was taken thereto.

In our opinion no recovery by the plaintiffs can be sustained on the record as it is before us. The fact is not only undisputed, but affirmatively testified to by the deceased himself while living, that he knew of the use made of track No. 8, and the manner in which crippled cars were handled upon that track. No claim is made that the injury complained of was caused by reason of any variance or departure on the part of the defendant from the methods usually employed in doing business, nor by reason of any variance or departure, by authority of the defendant, from the rules and regulations made for the government of the deceased and his fellow servants, which are conceded to have been

-sufficient. The case therefore falls within the well-settled rule that when a servant is as well informed as the master concerning the danger-ous character of the work, and voluntarily proceeds with it, he cannot hold the master responsible for the consequences. These views necessi-tate a reversal of the judgment without reference to the question as to what effect, if any, the death of Keenan, as shown by the record, may or ought to have upon the verdict of the jury, which question we do not deem it necessary to consider or decide. The judgment and order ap-pealed from should be reversed, and a new trial ordered, with costs to abide the event.